1  R. Brent Wisner, Esq, (SBN: 276023)
2  rbwisner@wisnerbaum.com
   Stephahnie Sherman, Esq. (SBN: 338390)
3  ssherman@wisnerbaum.com
4  **WISNER BAUM, LLP**
   11111 Santa Monica Boulevard, Suite 1750
5  Los Angeles, CA 90025
6  Telephone: (310) 207-3233
   Facsimile: (310) 820-7444
7
8  *Attorneys for Plaintiffs*

9              **UNITED STATES DISTRICT COURT**
10            **CENTRAL DISTRICT OF CALIFORNIA**
11               **LOS ANGELES DIVISION**
12

13  DIANE HOWARD, CHATHAM           Civil Action No.
    MULLINS, WILLIAM EISMAN,
14  CHRISTIAN M. RAINEY, and TRACEY  **CLASS ACTION COMPLAINT**
15  CUOMO, on behalf of themselves, and all
    others similarly situated, and the public,  **CONSUMER FRAUD, BREACH OF**
16                                              **EXPRESS & IMPLIED**
17                    Plaintiffs,              **WARRANTIES, AND UNJUST**
                                               **ENRICHMENT**
18          v.
19                                              **DEMAND FOR JURY TRIAL**
    ALCHEMEE, LLC, TARO
20  PHARMACEUTICAL USA, INC., and
    DOES 1 to 50, Inclusive,
21
22                    Defendants.
23
24
25
26
27
28

---

                  CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................... 1

II. THE PARTIES .................................................................................. 5

III. JURISDICTION AND VENUE ......................................................... 8

IV. GENERAL ALLEGATIONS ............................................................. 9

    A. DEFENDANTS ARE INDUSTRY LEADERS WHO AFFIRMED THIER COMMITTMENT TO SCIENCE AND SAFETY ........................ 9

    B. DEFENDANTS DID NOT COMPLY WITH FDA'S TESTING REQUIREMENTS BEFORE SELLING THE BPO PRODUCTS TO THE PUBLIC ................................................................................ 10

    C. DEFENDANTS KNEW OR SHOULD HAVE KNOWN THE BPO PRODUCTS DEGRADED TO BENZENE UNDER NORMAL USE AND HANDLING ................................................................... 11

    D. DEFENDANTS KNEW OR SHOULD HAVE KNOWN BENZENE WAS FOUND IN OTHER CONSUMER PRODUCTS BUT DID NOT TEST THE BPO PRODUCTS ............................................. 14

    E. DEFENDANTS IGNORED FDA'S BENZENE ALERT TO TEST THEIR PRODUCTS ........................................................... 15

    F. TESTING FOUND COMMON BPO PRODUCTS CONTAIN DANGEROUS LEVELS OF BENZENE IN EXCESS OF REGULATORY LIMITS .................................................... 16

    G. DEFENDANTS EXPOSED PLAINTIFFS, THE CLASS, AND THE PUBLIC TO BENZENE, A KNOWN HUMAN CARCINOGEN, WITHOUT THEIR KNOWLEDGE ............................................ 21

    H. DEFENDANTS MARKETED THEMSELVES AS EXPERTS BUT CONCEALED FROM CONSUMERS THEIR FAILURE TO TEST THE BPO PRODUCTS FOR SAFETY ..................................... 24

    I. DEFENDANTS DID NOT WARN CONSUMERS THE BPO PRODUCTS WERE AT RISK OF BENZENE CONTAMINATION ...... 25

i

J.    DEFENDANTS DIRECTLY MARKETED BPO PRODUCTS AT RISK OF BENZENE CONTAMINATION TO CHILDREN AND TEENAGERS ..............................................................................26

**V.    PUNITIVE DAMAGES ALLEGATIONS**...................................................**27**

**VI.    PLAINTIFF SPECIFIC ALLEGATIONS** ..........................................**28**

**VII.  CLASS ACTION ALLEGATIONS** ....................................................**32**

**VIII. CAUSES OF ACTION** .......................................................................**37**

A.    DEFENDANTS ENGAGED IN FALSE ADVERTISING IN VIOLATION OF VARIOUS STATE STATUTES, on *Behalf of the Hawaii and New York Subclasses* ..............................................37

B.    DEFENDANTS ENGAGED IN DECEPTIVE TRADE PRACTICES IN VIOLATION OF VARIOUS STATE STATUTES, *on Behalf of Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses* .............................................................39

C.    BREACH OF EXPRESS WARRANTY, *on Behalf of the Nationwide Class and all State Subclasses* .....................................44

D.    BREACH OF IMPLIED WARRANTY, *on Behalf of the Nationwide Class and all State Subclasses* .....................................45

E.    UNJUST ENRICHMENT, *on Behalf of the Nationwide Class and all State Subclasses* .........................................................46

**IX.  PRAYER FOR RELIEF** ..................................................................**47**

**X.    DEMAND FOR JURY TRIAL** .......................................................**48**

ii

CLASS ACTION COMPLAINT

Plaintiffs, DIANE HOWARD, CHATHAM MULLINS, WILLIAM EISMAN, CHRISTIAN M. RAINEY, and TRACEY CUOMO on behalf of themselves, the proposed Class and Subclasses (defined *infra*), and the public, bring this Class Action Complaint ("Class Action") against Defendants, alleging the following upon Plaintiffs' personal knowledge, or where Plaintiffs lacks personal knowledge, upon information and belief, including the investigation of counsel.

# I. <u>INTRODUCTION</u>

1.     This is a consumer fraud Class Action to redress the economic harms caused by Defendants' sale of benzoyl peroxide acne treatment drug products ("BPO Products") without warning consumers the BPO Products contain unsafe levels of the potent human carcinogen benzene, and that the BPO Products were at risk of degrading further into benzene under normal use, handling, and storage conditions.

2.     The BPO Products are "drugs" used to treat acne vulgaris ("acne") and are formulated with a chemical called benzoyl peroxide ("BPO"), along with other inactive ingredients, to make acne treatment creams, washes, scrubs, and bars.  Before being sold to the public, the BPO Products must be made in conformity with current good manufacturing practices and must conform to quality, safety, and purity specifications. Defendants' Products did not.

3.     BPO Products should not contain benzene, nor degrade into benzene, except under extraordinary circumstances.[1]  A drug is "adulterated" if it consists in whole or in part of any filthy, putrid, or decomposed substance, is impure, or mixed with another substance.[2]  Under the FDA Act, it is a crime to introduce or deliver "into interstate commerce any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded."[3] If benzene is found in any on-market or post-market Products, the drug is considered unlawful and adulterated and the drug manufacturer

---

[1] Food and Drug Administration, *Q3C – Tables and List Guidance for Industry* (2017), https://www.fda.gov/media/71737/download.
[2] 21 U.S.C. § 351(a)(2011); *see also* § 351(b)-(d) (noting that a lack of purity or mixture with another substance also renders drug adulterated).
[3] 21 U.S.C. § 331(a)(2010).

CLASS ACTION COMPLAINT

must contact the FDA to initiate a voluntary recall.[4]

4. Throughout this Complaint, references to federal law and FDA regulation are merely to provide context and are not intended to raise a federal question of law. All claims alleged herein arise out of violations of state law, which in no way conflict, interfere with, or impose obligations that are materially different than those imposed by federal law.

5. The BPO Products marketed and sold by the Defendants decomposed into benzene rendering them materially different than advertised, *i.e.*, by containing unsafe levels of benzene. Benzene is a known human carcinogen. Studies dating to the 1800s have led to a consensus within the medical and scientific communities that benzene exposure, even in low amounts, increases the risk of blood cancers and other adverse effects.

6. In 2023, Valisure, LLC,[5] an independent, accredited laboratory that has developed analytical methods to test drugs and consumer products for public safety, tested a representative sample of BPO and non-BPO products and found the BPO Products had dangerous levels of benzene, many multiple times higher than allowed in any regulated drug.[6] Using industry standard gas chromatography and detection by mass spectrometry ("GC-MS") instrumentation, with selected ion flow tube mass spectrometry ("SIFT-MS") for detection of benzene released into the air around certain

---

[4] Food and Drug Administration. (Dec. 22, 2022). *FDA Alerts Drug Manufacturers to the Risk of Benzene in Certain Drugs*, https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain drugs (last visited Feb. 9, 2024).

[5] Valisure is an independent third-party analytical laboratory that is accredited to International Organization for Standardization ("ISO/IEC") 17025:2017 standards for chemical testing (PJLA Accreditation Number 94238). In response to rising concerns about drug shortages, generics, and overseas manufacturing, Valisure developed and validated methods to test medications and consumer products distributed in the United States. Valisure has tested a variety of drug and consumer healthcare products for benzene including sunscreens, antiperspirants, body sprays, hand sanitizers, and dry shampoos for benzene. Valisure's testing results submitted to the FDA in its Citizen's Petitions, were widely publicized in the media leading to numerous recalls of contaminated consumer products. *See* Valisure Citizen's Petition on Benzoyl Peroxide (March 5, 2024), pp. 6-7, *see also* Valisure Detects Benzene in Sunscreen, https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-sunscreen; Bruce Y. Lee, Forbes, FDA: P&G Recalls Antiperspirant Sprays Due To Cancer Risk Of Benzene (Nov. 24, 2021), https://www.forbes.com/sites/brucelee/2021/11/24/fda-pg-recalls-antiperspirants-body-sprays-due-to-cancer-risk-of-benzene/?sh=69cf13c24f32; *see also* Sandee LaMotte, CNN, Antiperspirant recall: What the finding of a cancer-causing chemical means for you (Dec. 1, 2021), https://www.cnn.com/2021/12/01/health/deodorants-antiperspirants-recall-benzene-explainer-wellness/index.html.

[6] Valisure FDA Citizen's Petition on Benzoyl Peroxide (March 6, 2024).

BPO Products, the Products were incubated to temperatures common during consumer use, handling, and storage and then sampled for benzene.[7]  Levels as high as 1600 parts per million (ppm) were found in common BPO Products.[8]  Unexpectedly, researchers found that benzene was released into the surrounding air even when the BPO Products' packaging was closed raising concern for even more inhalation exposures—a particularly pernicious form of exposure to benzene.[9] For the non-BPO products tested, benzene was not present, or at trace levels below 2 ppm.[10]  Valisure filed a FDA Citizen's Petition on March 5, 2024 demanding an immediate BPO Product recall.[11] The Petition is pending.[12]

7.     The high levels of benzene found led Valisure to conduct a stability study on a diverse market sweep of BPO Products and formulations. Valisure's results show that on-market BPO Products can form over 800 times the conditionally restricted FDA concentration limit of 2 ppm for benzene, and the evidence suggests this problem applies broadly to BPO Products currently on the market.[13] Incubation of a Proactiv® product at the temperature of a hot car (70°C), a temperature the Products are expected to be exposed to through normal consumer and distributor handling, resulted in the detection of benzene in a compact car's volume of air at ~1,270 times the Environmental Protection Agency's ("EPA") calculated threshold for increased cancer risk by long-term inhalation exposure to benzene.[14]  Many of the other popular BPO Products had benzene levels many times higher than the 2 ppm benzene threshold leading Valisure to conclude that on-market BPO Products appear to be fundamentally

---

[7] *Id.*
[8] *Id.* at 17.
[9] *Id.* at 23.
[10] *Id.* at 15 ("76 non-BPO products had no detectable benzene or values below 0.1ppm. 6 non-BPO products contained traces of benzene below 2 ppm, which could be due to various inactive ingredients used in consumer products that have been theorized to contain trace benzene").
[11] Valisure BPO Citizen's Petition (March 5, 2024).
[12] Valisure's Petition was still pending as of this Class Action's filing.
[13] Valisure, LLC, (March 6, 2024), *Valisure Discovers Benzoyl Acne Treatment Products are Unstable and Form Benzene,* https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide (last visited March 6, 2024).
[14] *Id,*

3

CLASS ACTION COMPLAINT

1    unstable and form unacceptably high levels of benzene.[15]

2         8.    Although the BPO Products have been found to have high levels of

3    benzene, Defendants never listed benzene among the ingredients or anywhere on the

4    Products' labels, containers, advertising, or on its websites. Defendants never warned

5    anyone the Products had benzene or were at risk of benzene contamination.

6         9.    Defendants knew or should have known the BPO Products contain and/or

7    degraded into benzene when exposed to expected consumer use, handling, and storage

8    conditions. BPO is known, within the scientific community (but not among consumers)

9    to degrade into benzene according to the mechanism below:[16]



10    Default text

11

12

13    Benzoyl peroxide                                        Benzoic acid

14

15

16

17                                                  Benzoic acid                        Benzene

18         10.   Defendants misled Plaintiffs, the Class, the Subclasses, and the public by

19    representing the BPO Products only had the ingredients listed, and not benzene.

20    Defendants misled Plaintiffs, the Class, the Subclasses, and the public by representing

21    the BPO Products were safe while concealing material health and safety information

22    known to them, *e.g.*, the BPO Products degraded to benzene, or were contaminated

23    with benzene.  Defendants misled Plaintiffs, the Class, the Subclasses, and the public

24    by giving the BPO Products long expiration dates of 2-3 years, affirming to consumers

25    _____

26         [15] *Id.*
         [16] The disposition of benzoyl peroxide to form benzene. Benzoyl peroxide is known to thermally decompose to

27    form two molecules of benzoyloxy radicals that can further decompose to benzoic acid or phenyl radicals with liberation of
     carbon dioxide. The phenyl radicals can then produce benzene.  *See* Shang-Hao Liu,  et al, *Thermal hazard evaluation of*

28    *the autocatalytic reaction of benzoyl peroxide using DSC and TAM III*, THERMOCHIMICA ACTA, Volume 605, Pages
     68-76, , (2015), ISSN 0040-603, https://www.sciencedirect.com/science/article/pii/S004060311500057X.

CLASS ACTION COMPLAINT

1 the BPO Products were safe for use for years when Defendant knew or should have
2 known the BPO Products degraded much sooner to benzene.

3      11.    Defendants' statements and omissions of material health and safety
4 information unreasonably placed Plaintiffs, the Class, the Subclasses, and the public at
5 risk of exposure to benzene without their knowledge and consent. Defendants'
6 statements about the Products were false, misleading, unsubstantiated, and blatantly
7 deceptive.

8      12.    As a result of Defendants' misconduct and consumer deception, the
9 Plaintiffs, the Class, the Subclasses, and the public have been economically harmed, as
10 they purchased a product that they otherwise would have never purchased.  They were
11 also physically harmed by being exposed to a known human carcinogen.

12      13.    This Class Action is necessary to redress the harms caused to Plaintiffs, the
13 Class, and Subclass members who bought the Products believing them to be safe and
14 only containing the ingredients on the Products' labels, containers, in advertising, and
15 on Defendants' websites.  This Class Action is further necessary to expose Defendants'
16 ongoing consumer fraud and to enjoin Defendants from continuing their misconduct
17 and deception to protect the public.

18      14.    Plaintiffs bring this Class Action on behalf of themselves, and on behalf of
19 those similarly situated, and seek to represent a National Class of consumers who
20 bought the Products and State Subclasses of consumers from Connecticut, Hawaii,
21 Illinois, Maryland, Missouri, Massachusetts, Nevada, New York, Ohio, Pennsylvania,
22 Rhode Island, and Washington (defined *infra*). Plaintiffs seek damages, reasonable
23 attorneys' fees and costs, interest, restitution, other equitable relief, including an
24 injunction and disgorgement of all benefits and profits Defendants received from
25 misconduct.

26                          **II. <u>THE PARTIES</u>**

27      15.    Plaintiff Diane Howard is an Illinois resident, located in Sangamon County,
28 who bought BPO Products including, but not limited to, Proactiv+ Skin Smoothing

**CLASS ACTION COMPLAINT**

Exfoliator, Proactiv Cleanse-Renewing Cleanser, Proactiv Emergency Blemish Relief, and Proactiv Repairing Treatment from October 2018 to August 2023. Plaintiff has suffered economic damages and a result of Defendants' violations of the consumer protection laws alleged herein. Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that it could degrade into benzene.

16.     Plaintiff Chatham Mullins is a Massachusetts resident, located in Suffolk County, who bought BPO Products including, but not limited to, Proactiv+ Skin Smoothing Exfoliator, Proactiv Solution® Renewing Cleanser, Proactiv+ Pore Targeting Treatment, Clearasil Stubborn Acne Control 5 in 1 Spot Treatment Cream, Equate Beauty 10% Benzoyl Peroxide Acne Treatment Gel, and Walgreens' Daily Creamy Benzoyl Peroxide Acne Face Wash from 2005 to 2023. Plaintiff has suffered economic damages and a result of Defendants' violations of the state consumer protection laws alleged herein. Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that it could degrade into benzene.

17.     Plaintiff William Eisman is a Missouri resident, located in Warren County, who bought BPO Products including, but not limited to, Proactiv+ Skin Smoothing Exfoliator, Proactiv Solution® Renewing Cleanser, Proactiv+ Pore Targeting Treatment, and Proactiv Emergency Blemish Relief from 2013 to 2024. Plaintiff has suffered economic damages and a result of Defendants' violations of the consumer protection laws alleged herein. Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that it could degrade into benzene.

18.     Plaintiff Christian M. Rainey is a Washington resident, located in Pierce County, who bought BPO Products including, but not limited to, Proactiv Emergency Blemish Relief, Proactiv+ Pore Targeting Treatment, Proactiv+ Skin Smoothing Exfoliator, and Proactiv Solution Renewing Cleanser from 2008 to February 2024.

CLASS ACTION COMPLAINT

Plaintiff has suffered economic damages and a result of Defendants' violations of the consumer protection laws alleged herein. Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that it could degrade into benzene.

19.     Plaintiff Tracey Cuomo is a Connecticut resident, located in Middlesex County, who bought BPO Products including Proactiv Solution Renewing Cleanser and Proactiv Emergency Blemish Relief from March 2022 to July 2023. Plaintiff has suffered economic damages and a result of Defendants' violations of the consumer protection laws alleged herein. Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that it could degrade into benzene.

20.     Defendants Alchemee LLC ("Alchemee") is a citizen of California with its principal place of business at 120 Broadway, Suite 500, Santa Monica, California 90401. Defendants Taro Pharmaceuticals U.S.A., Inc. is the parent company of Alchemee.  Taro and Alchemee sell and distribute BPO Products under the brand name Proactiv.  The Proactiv Products include, *inter alia*: (1) Proactiv+ Skin Smoothing Exfoliator, (2) Proactiv Solution® Repairing Treatment, (3) Proactiv Solution® Renewing Cleanser, (4) Proactiv+ Pore Targeting Treatment, and (5) Proactiv Emergency Blemish Relief. At all relevant times, Alchemee conducted business and derived substantial revenue from its manufacturing, advertising, marketing, distributing, and selling of the Products within the State of California and in this District.

21.     Defendants Taro Pharmaceuticals U.S.A., Inc. ("Taro") is a citizen of New York with its principal place of business in Hawthorne, New York.  Taro is the parent company of Alchemee.  Taro and Alchemee sell and distribute BPO Products under the brand name Proactive.  At all relevant times, Taro conducted business and derived substantial revenue from its manufacturing, advertising, marketing, distributing, and selling of the Products within the State of California and in this District.

22.     The term "Defendants" and/or "Defendants" refers to the Alchemee and/or Taro pending further discovery into the roles and responsibilities of each and or collectively regarding the BPO Products.

23.     Defendants and their agents promoted, marketed, and sold the Products in California and in this District. The unfair, unlawful, deceptive, and misleading advertising and labeling of the Products were prepared and/or approved by Defendants and their agents and were disseminated by Defendants and their agents through labeling and advertising containing the misrepresentations alleged and disseminated uniformly through advertising, packaging, containers, and via websites and social media.

### III. <u>JURISDICTION AND VENUE</u>

24.     This Court has jurisdiction over this matter because the amount in controversy exceeds $5 million satisfying 28 U.S.C. § 1332(d)(2) for subject matter jurisdiction.  This Court has supplemental jurisdiction over any state law claims under 28 U.S.C. § 1367.

25.     Venue is proper in the District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District and Defendants Alchemee resides in this District.

26.     This Court has personal jurisdiction over the Defendants Alchemee and Taro because Defendants Alchemme is a resident of California, and further both Defendants Alchemee and Taro transact business in California, including in this District, have substantial aggregate contacts with the State of California, including in this District, engaged in misconduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of injuring people in this District, and purposely availed themselves of the benefits of doing business in the State of California, and in this District.

27.     To the extent applicable, the Court also has pendant personal jurisdiction over claims alleged against Defendants that involve the same common nucleus of facts and actions that give rise to Plaintiff's claims that otherwise have proper personal

8

CLASS ACTION COMPLAINT

jurisdiction within this Court.

## IV.   GENERAL ALLEGATIONS

28.   Fifty million Americans suffer from acne annually.[17] Acne is the most common skin condition in the United States with a prevalence among adolescents of almost 95 percent.[18] Acne can begin as early as age seven and, for some, can persist through adulthood and into ages 50s and 60s.[19]  Millions of acne sufferers seek treatment every year making it a billion-dollar industry and a key business segment for Defendants, who are among America's most prominent companies.

29.   Some of Defendants most profitable acne treatment products contain BPO. To make the finished BPO Products, BPO, a dry white powder, is mixed with other ingredients to create topical drug creams, cleansers, scrubs, and washes for use on the face and body. BPO is formulated into these Products at concentrations up to 10%. Defendants' BPO Products include: Proactiv+ Skin Smoothing Exfoliator, Proactiv Solution® Repairing Treatment, Proactiv Solution® Renewing Cleanser, Proactiv+ Pore Targeting Treatment, and Proactiv Emergency Blemish Relief.

### A.   DEFENDANTS ARE INDUSTRY LEADERS WHO AFFIRMED THIER COMMITTMENT TO SCIENCE AND SAFETY

30.   Defendants' Products are widely marketed, available, sold, and used by children, teenagers, and adults throughout the United States and the world. The acne treatment industry is a highly competitive billion-dollar market. To remain relevant and top of mind, Defendants spend millions of dollars every year promoting the Products directly to consumers, including teenagers on social media and through music sites like Tik Tok and Snap Chat, which skew young.  Defendants make promises to consumers to influence their purchasing decisions such as affirming the Products are tested, backed by science, and approved by dermatologists.  Defendants told consumers they should buy their Products because Defendants are market leaders and acne experts who

---

[17] American Association of Dermatology, https://www.aad.org/media (visited October 24, 2023).
[18] JL Burton et al., *The prevalence of acne vulgaris in adolescence*, BR J DERMATOL,(1971);85(2):119–126.
[19] *Id.*

CLASS ACTION COMPLAINT

1    care about consumers, the environment, and only sell safe and tested Products.

2        31.    Proactiv is a registered trademark of Taro and is distributed in the U.S.

3    through Taro's subsidiary, Alchemee, based in Santa Monica, California.  Taro

4    marketed itself to Plaintiffs, the Class, and Subclasses, as a research-based international

5    pharmaceutical company whose success and growth were founded upon its

6    commitment to research and development. Taro was started in the 1950s and entered

7    the U.S. market in the 1980s.  Taro makes hundreds of prescriptions, over the counter,

8    and generic topical dermatological products used by millions of Americans every year,

9    including well known products such as hydrocortisone and antibiotic creams.[20] Taro

10   employs hundreds of scientists globally with 16% of its employees working in research

11   and development.[21]

12       32.    Defendants' Proactiv brand has been wildly popular among teenagers due

13   to Defendants' use of celebrity influencers and direct marketing to teenagers on social

14   media sites including TikTok and its predecessor site Musical.ly.

**B.    DEFENDANTS DID NOT COMPLY WITH FDA'S TESTING REQUIREMENTS BEFORE SELLING THE BPO PRODUCTS TO THE PUBLIC**

18       33.    Despite Defendants' position as a market leader and social media

19   influencer popular among teenagers, Defendants did not adequately test their Products

20   before selling them to Plaintiffs, the Class, the Subclasses, and the public. Defendants'

21   Products are "drugs" regulated by the FDA.  As with any regulated drug, Defendants

22   must follow current good manufacturing practices ("CGMPs"), have scientifically

23   sound specifications, and must have test procedures and processes to ensure the drug's

24   components (active and inactive ingredients), and finished products are safe.  Both raw

25   ingredient materials and finished batches must be tested before released to the public to

26   confirm they meet specifications for identity, strength, quality, and purity.[22]  If testing

---

[20] Taro Pharmaceuticals Industries, Ltd., USA, https://www.taro.com/usa (last visited October 24, 2023).
[21] Taro Pharmaceuticals Industries, Ltd., USA (March 31, 2023) *Form 20-F*, http://www.sec.gov/edgar.shtm.
[22] 21 C.F.R. § 211.84 (1978); *see also* 21 C.F.R. § 211.160 (1978).

results of the raw materials or finished product do not conform with the specifications, the product cannot be sold to the public.  Defendants must also re-test any Products subject to deterioration.[23]  Any Products not made in conformity with the CMGPs is considered "adulterated" under 501(a)(2)(B) of the Food, Drug, and Cosmetic Act.[24]

34.     Defendants must also do stability testing to understand the "shelf life" of the Products and to assign an expiration date. It is well known that certain chemical ingredients can degrade or change because of environmental, and storage conditions such as light, moisture, temperature, and humidity, or because of the passage of time. The stability testing should cover all expected distributor and consumer storage, handling, and use conditions and must be done using "reliable, meaningful, and specific test methods."[25] If stability testing finds a drug product is not stable under expected storage or use conditions, degrades, or create toxic byproducts, the product cannot be sold to the public.

35.     The CGMPs and stability test requirements are there to ensure drug products are safe for public use. These are the minimum requirements. Because the drug manufacturers are self-regulated, the FDA must rely on drug manufacturers, the public, and concerned citizens to report unsafe drugs. The FDA cannot force a drug manufacturer to recall a contaminated drug.[26]

**C.     DEFENDANTS KNEW OR SHOULD HAVE KNOWN THE BPO PRODUCTS DEGRADED TO BENZENE UNDER NORMAL USE AND HANDLING**

36.     Defendants knew or should have known the Products degrade to benzene

---

[23] 21 C.F.R. § 211.160(b)(1)(1978).

[24] 21 C.F.R. § 225.1 (1976). Under 501(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act a drug is considered "adulterated" (poorer in quality by adding another substance) if the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with CGMP; *see also* Food and Drug Administration, *Facts About the Current Good Manufacturing Practices (CGMP);* https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practices-cgmp (last visited Feb. 11, 2024).

[25] 21 CFR 211.166.

[26] Food and Drug Administration, *Facts About the Current Good Manufacturing Practices (CGMP);* https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practices-cgmp (last visited Feb. 11, 2024).

**CLASS ACTION COMPLAINT**

1    when exposed to heat.  Defendants knew that, because of the chemical nature of the

2    active and inactive ingredients, including BPO, the BPO Products were not stable and

3    would degrade when exposed to heat from normal distributor and consumer use,

4    handling, and storage conditions.

5          37.    It is well known that BPO degrades to benzene when exposed to heat over

6    time.  This process was first reported in the scientific literature as early as 1936.[27] BPO

7    degrades into benzene according to the mechanism below.[28]

8

9

10

11



12

13

14

15          38.    The degradation of BPO to benzene was known or should have been

16    known to the Defendants, who promote themselves as dedicated to science and

17    research.  Defendants market themselves as world class acne drug researchers,

18    developers, and sellers. Defendants employed high-level scientists, chemists, and

19    researchers to formulate their drug products for public use. Defendants with these

20    resources and expertise were aware of the well-known chemical processes that degrade

21    their BPO Products into benzene when exposed to common use temperatures and

22    conditions.

23          39.    Defendants further knew or should have known that specific ingredients

24

25    _____

26    [27] H. Erlenmeyer and W. Schoenauer, *Über die thermische Zersetzung von Di-acyl-peroxyden,* HELU. CHIM. ACTA, 19, 338 (1936), https://onlinelibrary.wiley.com/doi/10.1002/hlca.19360190153 (last visited Feb. 5, 2024).

27    [28] Benzoyl peroxide is known to thermally decompose to form two molecules of benzoyloxy radicals that can further decompose to benzoic acid or phenyl radicals with liberation of carbon dioxide. The phenyl radicals can then produce benzene.  *See* Shang-Hao Liu et al.,, *Thermal hazard evaluation of the autocatalytic reaction of benzoyl peroxide*

28    *using DSC and TAM III*, THERMOCHIMICA ACTA, Volume 605, (2015), Pages 68-76, ISSN 0040-6031, https://www.sciencedirect.com/science/article/pii/S004060311500057X (last visited Feb. 5, 2024).

12

CLASS ACTION COMPLAINT

derived from hydrocarbons increased the risk the BPO Products would yield benzene.[29] At-risk ingredients include carbomers, mineral spirits, and other petroleum derived substances. These ingredients are red flags for risk of benzene contamination. The FDA published guidance in 2022 urging the industry to reformulate drug products at risk of benzene contamination.[30]  The FDA's alert highlighted ingredients made from hydrocarbons, including carbomers (thickening agents), urging drug manufacturers to test products containing them for benzene contamination.[31] Many of the Defendants' Products contain hydrocarbons and carbomers but none have been recalled due to benzene contamination.

40.    Defendants knew or should have known through their own research, development, formulation, manufacturing, and testing whether the BPO Products were chemically and physically stable. Defendants were required not only to adequately test the BPO Products for safety and stability before selling them to the public, but also to monitor their internal practices, processes, and specifications to make sure they kept pace with science and emerging methodologies.  Defendants knew or should have known from expiration and stability studies examining the "shelf life" of the BPO Products, the chemical changes took place because of normal and expected environmental, use, and storage conditions.

41.    Defendants knew or should have known the BPO Products would be handled, used, and stored by distributors, sellers, and consumers under various temperatures that affect chemical stability. Defendants knew or should have known the BPO Products would travel by commercial carriers and distributors in varying storage conditions and would be stored by consumers in handbags, backpacks, bathrooms, showers, lockers, and in vehicles during warm months where the BPO Products would

---

[29] Food and Drug Administration. (Dec. 22, 2022). *FDA Alerts Drug Manufacturers to the Risk of Benzene in Certain Drugs.*
[30] Food and Drug Administration. *Reformulating Drug Products That Contain Carbomers Manufactured With Benzene* (December 27, 2023), https://www.fda.gov/regulatory-information/search-fda-guidance- documents/reformulating-drug-products-contain-carbomers-manufactured-benzene.
[31] *Id; see also* December 22, 2022 FDA Alert at 1.

CLASS ACTION COMPLAINT

be exposed to heat. Defendant knew or should have known consumers would apply the benzene contaminated BPO Products to their faces and bodies and would also use the BPO Products in heated showers as scrubs and washes. Defendants knew or should have known the BPO Products would be used and applied to the skin at normal body temperatures, and elevated temperatures following showers or baths, after physical activity, and after the BPO Products sat in warm temperatures or hot vehicles.

42.    These storage, use, and handling conditions were known or should have been known to Defendants before the BPO Products were marketed and sold to Plaintiffs, the Class, and Subclass members. Defendants knew or should have known the BPO Products degrade to benzene under these conditions exposing consumers to benzene.  Defendants further knew or should have known that, because of the known degradation of BPO to benzene, their BPO Products were contaminated with benzene by the time they reached consumers, but they sold them to Plaintiffs, the Class, the Subclasses, and the public anyway, without warning of the risk of exposure.  Moreover, the 2–3-year shelf life printed on the BPO Products told consumers they were safe for use for years, when they were not.

**D.    DEFENDANTS KNEW OR SHOULD HAVE KNOWN BENZENE WAS FOUND IN OTHER CONSUMER PRODUCTS BUT DID NOT TEST THE BPO PRODUCTS**

43.    Defendants was aware or should have been aware of benzene contamination in other on-market drug and healthcare products when they marketed and sold the BPO Products to Plaintiffs, the Class, the Subclasses and the public but did not test the BPO Products for benzene contamination.  In 2020, the FDA started working with companies to identify benzene in products, which resulted in product recalls of hand sanitizers, sunscreens, and deodorants.  In 2021, an independent chemical analysis by Valisure of hundreds of sunscreens and after-sun care products from 69 brands found 27 percent of the batches had significant levels of benzene above

14

the FDA 2 ppm limit.[32]

**E.    DEFENDANTS IGNORED FDA'S BENZENE ALERT TO TEST THEIR PRODUCTS**

44.    In 2022, the FDA issued a safety alert warning drug manufacturers of the risk of benzene contamination in certain drug products and drug components. The FDA reiterated the risk benzene exposure poses to public health and the drug manufacturers' obligations to test drug products under the U.S. Code of Federal Regulations, Title 21:

> FDA reminds manufacturers they are required to establish scientifically sound and appropriate specifications and test procedures to assure drug components (active and inactive ingredients) and finished drug products conform to appropriate quality specifications (21 C.F.R. 211.84, 21 C.F.R. 211.160). This includes testing of raw materials and finished batches (21 C.F.R. 211.165) prior to release to ensure they meet appropriate specifications for identity, strength, quality, and purity.[33]

45.    The FDA warned drug manufacturers that any drug products or components at risk of benzene contamination should be tested, and any batches with benzene above 2 ppm should not be released to the public.[34]  The FDA further warned that, if any drug or drug component was subject to deterioration, drug manufacturers must have re-testing procedures in place to ensure continued purity and stability.  The FDA recommended risk assessments to evaluate the possibility of benzene contamination in the drug products or components.[35]  If any drug product in circulation was found to have benzene over 2ppm, the FDA directed that drug manufacturers contact the FDA to discuss a voluntarily recall.[36]

46.    To date, none of the Defendants' BPO Products have been recalled due to benzene contamination.

---

[32] Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products, May 24, 2021.
[33] Federal Drug Administration. (Dec. 22, 2022). *FDA Alerts Drug Manufacturers to the Risk of Benzene in Certain Drugs,* 1.
[34] *Id.*, 3.
[35] *Id.*
[36] *Id.*, 2.

CLASS ACTION COMPLAINT

## F.   TESTING FOUND COMMON BPO PRODUCTS CONTAIN DANGEROUS LEVELS OF BENZENE IN EXCESS OF REGULATORY LIMITS

47.   Testing by Valisure in 2023 found common acne treatment products formulated with BPO are not only contaminated with benzene but have levels dangerous to public health. Valisure is an accredited independent laboratory who has developed validated analytical methods[37] to test drugs and consumer products to address rising concerns about public safety. Valisure has tested a wide variety of drugs and products for benzene including sunscreens, antiperspirants, hand sanitizers, and dry shampoos. Their work has led to widely publicized product recalls protecting the public from dangerous and carcinogenic consumer products.[38]

48.   In 2023, Valisure tested 175 finished acne treatment products to determine whether any had benzene.  Of the 175 products tested, 99 were formulated with BPO, 58 had active ingredients (either individually or in combination) of salicylic acid, sulfur, adapalene, azelaic acid, niacinamide and zinc, and 18 had no drug ingredients.[39] 83 of the BPO Products were purchased over the counter from major retailers and 16 were prescription products purchased from licensed wholesalers.[40] The BPO Products included popular Products: Proactiv 2.5% BPO Cream, Target Up & Up 2.5% BPO

---

[37] Valisure's test methods largely mirror those utilized by FDA's own "Drug Quality Sampling and Testing" ("DQST") Program. Valisure FDA Citizen's Petition at 4.

[38] *See* Valisure May 24, 2021 Citizen Petition on Benzene in Sunscreen and After-sun Care Products, https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-sunscreen); Valisure's Citizen Petition on Hand Sanitizer Products Containing Benzene Contamination (filed March 24, 2021), https://www.regulations.gov/document/FDA-2021-P-0338-0001), Valisure's Citizen Petition on Benzene in Sunscreen and After-sun Care Products (filed May 24, 2021), https://www.regulations.gov/document/FDA-2021-P-0497-0001), Valisure's Citizen Petition on Benzene in Body Spray Products (filed November 3, 2021, https://www.regulations.gov/document/FDA-2021-P-1193-0001), Valisure's Citizen Petition on Benzene in Dry Shampoo Products (filed October 31, 2022),  https://www.regulations.gov/document/FDA-2022-P-2707-0001) *see also* CNET, Dry Shampoo Recall: What Is Benzene and Which Brands Are Affected https://www.cnet.com/health/personal-care/dry-shampoo-recall-what-is-benzene-and-which-brands-are-affected/ (identifying 19 types of dry shampoo have been recalled due to benzene content); Ryan Basen, Medpage Today, After Valisure Petition, Ol' Dirty Benzene Forces Another Recall (November 30, 2021), https://www.medpagetoday.com/special-reports/exclusives/95929 ("After Valisure Petition, Ol' Dirty Benzene Forces Another Recall"); Bruce Y. Lee, Forbes, FDA: P&G Recalls Antiperspirant Sprays Due To Cancer Risk Of Benzene (Nov. 24, 2021),  https://www.forbes.com/sites/brucelee/2021/11/24/fda-pg-recalls-antiperspirants-body-sprays-due-to-cancer-risk-of-benzene/?sh=69cf13c24f32; *see also* Sandee LaMotte, CNN, Antiperspirant recall: What the finding of a cancer-causing chemical means for you (Dec. 1, 2021),  https://www.cnn.com/2021/12/01/health/deodorants-antiperspirants-recall-benzene-explainer-wellness/index.html.

[39] *See* Valisure Citizen's Petition on Benzoyl Peroxide (March 5, 2024).

[40] *Id.*

CLASS ACTION COMPLAINT

Cream, Equate Beauty 10% BPO Cream, Equate BPO Cleanser, Neutrogena 10% BPO Cleanser, Clearasil 10% BPO Cream, CVS Health 10% BPO Face Wash, Walgreens 10% BPO Cream, La Roche Posay BPO Cream, and Clean & Clear 10% BPO Lotion.

49.    Valisure used three incubation temperatures to evaluate the effects of common distributor and consumer use, handling, and storage conditions on benzene formation. 37°C/98.6°F was used for human body temperature, 50°C/122°F was used to evaluate shelf-life performance as an accelerated stability testing temperature used by the pharmaceutical industry,[41] and 70°C/158°F to model storage in a hot vehicle.[42] The BPO Products were incubated at 37°C for four weeks and 50°C for three weeks and benzene concentration was measured at certain time intervals using GC-MS. Benzene findings were plotted in real time and reported in parts per million ("ppm"). The results below were submitted to the FDA in Valisure's March 5, 2024 Citizen's Petition on Benzoyl Peroxide.[43]

**4A**



[41] Ghimire, Prakash et al., *Guidelines on Stability Studies of Pharmaceutical Products and Shelf-Life Estimation.* INTERNATIONAL JOURNAL OF ADVANCES IN PHARMACY AND BIOTECHNOLOGY, (2020). 06. 15-23. 10.38111/ijapb.20200601004.

[42] Grundstein A, Meentemeyer V, Dowd J. *Maximum vehicle cabin temperatures under different meteorological conditions.* Int J Biometeorol. 2009 May;53(3):255-61. doi: 10.1007/s00484-009-0211-x. Epub 2009 Feb 21. PMID: 19234721.

[43] Valisure, LLC, https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide, link from their website (last accessed March 6, 2024).

1
2
3
4
5
6
7
8

**4B**



9
10
11
12
13
14
15
16

**4C**



17
18
19
20
21
22
23
24
25
26
27
28

**4D**



CLASS ACTION COMPLAINT

**4E**



**4F**



**4G**



CLASS ACTION COMPLAINT

1    **4H**



50.    Valisure found the BPO formulated products were not chemically stable and yielded benzene at levels well over 2 ppm, the maximum amount allowed in any U.S. regulated drug. Some of the benzene levels were many times higher than 2 ppm reaching as high as 1700 ppm for Proactiv's 2.5% BPO Cream and over 400 ppm for Proactiv's 5.0% BPO Cream.[44] Proactiv's BPO Products consistently topped the charts for benzene levels above than 2 ppm allowed in acne drug products.

51.    The concentration of BPO in the Products did not influence the benzene levels. Unexpectedly, Valisure found that benzene vapors leaked from some of the Products' packaging contaminating the surrounding air even when the packaging was closed raising concern for additional inhalation exposures.[45]

52.    Valisure concluded that all on-market BPO acne formulations seem to be fundamentally unstable and form unacceptably high levels of benzene under normal use, handling, and storage temperatures, but no such evidence was observed for acne treatment products not formulated with BPO.[46]  The finding that additional benzene leaked into the surrounding air from the products' containers means the total consumer benzene exposure would be even more dangerous than the levels reported.

53.    Valisure filed a Citizen's Petition on Benzoyl Peroxide on March 5, 2024[47]

---

[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] As of the date of filing this Class Action, Valisure's FDA Petition was pending.

20

**CLASS ACTION COMPLAINT**

1  with the FDA requesting the FDA Commissioner to immediately demand a recall of all
2  Products formulated with BPO and further to require that drug manufacturers do
3  independent chemical verification.[48]

4  **G.    DEFENDANTS EXPOSED PLAINTIFFS, THE CLASS, AND THE**
5  **PUBLIC TO BENZENE, A KNOWN HUMAN CARCINOGEN,**
6  **WITHOUT THEIR KNOWLEDGE**

7  54.    Although benzene has been found in the BPO Products and released into
8  the surrounding air from the packaging, Defendants did not list benzene among the
9  Products' ingredients, on the Products' label or container, or anywhere in their
10 advertising or on their websites.  Defendants did not (and still do not) warn that the
11 Products contain benzene, are at risk of benzene contamination, or that the product
12 could cause consumers to be exposed to benzene even when sealed.

13 55.    Benzene is a carcinogen that has been among the most studied toxins over
14 the last 100 years due to its wide use during the industrial revolution, extreme danger,
15 and known ability to cause cancer and death in humans and animals. The medical
16 literature linking benzene to blood cancers is vast dating to the 1930s.[49] Benzene is the
17 foundation component for many chemicals used to make plastics, resins, synthetic
18 fibers, paints, dyes, detergents, drugs, and pesticides. In the past, benzene was widely
19 used as a solvent in industrial paints, paint removers, adhesives, degreasing agents,
20 denatured alcohol, and rubber cements. Benzene use has declined due to the
21 proliferation of worker studies and an ever-growing body of evidence confirming
22 benzene's contribution to blood cancers.

[48] Valisure, LLC, (March 6, 2024), *Valisure Discovers Benzoyl Acne Treatment Products are Unstable and Form Benzene,* https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide (last visited March 6, 2024).

[49] *See* Hamilton A., *Benzene (benzol) poisoning,* ARCH PATHOL, (1931):434-54, 601-37; Hunter FT, *Chronic exposure to benzene (benzol). Part 2:  The clinical effects*. J. IND. HYG TOXICOL, (1939):21 (8) 331-54; Mallory TB, et al.,*Chronic exposure to benzene (benzol).Part 3:The pathological results.* J. IND. HYG TOXICOL,(1939):21 (8) 355-93; Erf LA, Rhoads CP., *The hematological effects of benzene (benzol) poisoning.* J. IND. HYG TOXICOL, (1939):21 421-35; American Petroleum Institute, *API Toxicological Review: Benzene,* NEW YORK, (1948); Infante PF, Rinsky RA, Wagoner JK, et al., *Leukemia in benzene workers*,LANCET, (1977);2 (8028): 76-78.

21

56.     Benzene has no known safe level of exposure.[50] Benzene causes central nervous system depression and destroys bone marrow, leading to injury in the hematopoietic system.[51] The International Agency for Research on Cancer ("IARC") classifies benzene as a "Group 1 Carcinogen" that causes cancer in humans, including acute myelogenous leukemia ("AML").[52]  AML is the signature disease for benzene exposure with rates of AML particularly high in studies of workers exposed to benzene.[53]

57.     Benzene exposure is cumulative and additive.  There is no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive fashion."[54]

58.     The Agency for Toxic Substances and Disease Registry's ("ATSDR") "Tox Facts" for benzene warns that people can be exposed to benzene vapors from benzene-containing products and that benzene harms the blood marrow, causing leukemia and anemia, and affects the immune system leaving victims vulnerable to infection.[55]

59.     According to the FDA, benzene in small amounts over long periods of time can decrease the formation of blood cells and long-term exposure through inhalation, oral intake, and skin absorption may result in cancers such as leukemia and other blood disorders.[56]

60.     Benzene is a major industrial chemical made from coal and oil that is heavily regulated by the EPA as an important environmental pollutant that negatively

[50] Harrison R, Saborit, J., *WHO Guidelines for Indoor Air Quality – Selected Pollutants, (2010); see also* Smith, Martyn T. (2010). Advances in Understanding Benzene Health Effects and Susceptibility. *Annual Review of Public Health., (*2010) Vol. 31:133-148.
[51] FDA Toxicological Data for Class 1 Solvents, Appendix 4, *Benzene*, https://www.fda.gov/media/71738/download.
[52] International Agency for Research on Cancer. *Benzene, IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Volume 120,* LYON, France: World Health Organization, (2018).
[53] American Cancer Society, *Benzene and Cancer Risk,*  https://www.cancer.org/cancer/risk-prevention/chemicals/benzene.html (last visited October 20, 2023).
[54] Smith, Martyn T., *Annual Review of Public Health,* ADVANCES IN UNDERSTANDING BENZENE HEALTH EFFECTS AND SUSCEPTIBILITY *(*2010) Vol. 31:133-148.
[55] Agency for Toxic Substances and Disease Registry, *Benzene – Tox Facts*, CAS # 71-43-2.
[56] Federal Drug Administration. (June 9, 2022). *Frequently Asked Questions:* https://www.fda.gov/drugs/drug-safety-and-availability/frequently-asked-questions-benzene-contamination-drugs.

22
CLASS ACTION COMPLAINT

affects the soil, air, and groundwater. Waste and air emissions containing benzene are considered hazardous waste. The coal, oil, paint, and chemical industries are heavily regulated due to the emission of carcinogens including benzene from refining and other industries processes involving benzene and benzene byproducts, which can end up in the air, water, and food supply.

61.   Benzene is heavily regulated to protect public health and should not be in drug products, especially ones such as acne treatment that are used daily by children and teenagers for many years. The FDA drug guidelines specify that benzene must not be used to make drugs products because of the unacceptable toxicity and deleterious environmental effects.[57]   The FDA allows one limited exception – where the use of benzene in a drug product is unavoidable to produce a drug product with a significant therapeutic advance. In that instance, benzene must be restricted to two parts per million (ppm).[58]   Defendants' BPO Products do not meet this rare exception.

62.   Benzene is heavily regulated in the workplace. The U.S. Occupational Safety and Health Administration ("OSHA") set an eight-hour exposure standard of 1 ppm.[59]   The National Institute for Occupational Safety and Health ("NIOSH") established a recommended exposure level (REL) of 0.1 ppm (15-minute ceiling limit). Subsequent exposure studies known as the "China studies" confirmed cancer at levels below 1 ppm.[60]   The benzene levels created from Defendantss' BPO Products are many times higher than the levels reported in these worker studies and the acceptable limits set by regulators.

63.   Benzene can also pass from the mother's blood to a developing fetus causing the baby to be exposed to benzene.[61]   Animal studies have shown low birth

---

[57] Food and Drug Administration, *Q3C – Tables and Lists Guidance for Industry,* https://www.fda.gov/media/71737/download (last visited September 26, 2023).
[58] *Id.*
[59] OSHA. Occupational exposure to benzene:  Final rule. Fed. Reg. 1987;52-34460-578.
[60] *See* Lan Q, Zhang L et al., *Hematotoxicity in Workers Exposed to Low Levels of Benzene,* SCIENCE, (December 3, 2004); Costa-Amaral I, V. B. L., *Environmental Assessment and Evaluation of Oxidative Stress and Genotoxicity Biomarkers Related to Chronic Occupational Exposure to Benzene,* INT J ENVIRON RES PUBLIC HEALTH, (2019) Jun; 16(12): 2240.
[61] *Id.*

23

CLASS ACTION COMPLAINT

weights, delayed bone formation, and damage to the bone marrow of developing offspring when pregnant animals breathed benzene.[62]

64.    Plaintiffs and the Class were exposed to benzene from the BPO Products by inhalation and dermal absorption. Benzene can be absorbed into the body via inhalation, skin absorption, ingestion, and/or eye contact.[63] Plaintiffs and the Class applied the BPO Products to areas of the skin including the face, neck, chest, and back one to three times per day and used the BPO Products as washes or scrubs in heated showers.  Plaintiffs and the Class were also exposed to benzene leaked from contaminated BPO Products.

## H.    DEFENDANTS MARKETED THEMSELVES AS EXPERTS BUT CONCEALED FROM CONSUMERS THEIR FAILURE TO TEST THE BPO PRODUCTS FOR SAFETY

65.    Defendants' BPO Products degrade to benzene, during normal and expected handling, use, or storage but Defendants did not warn about benzene contamination or the health risks of exposure.  Instead, Defendants made broad sweeping claims that the BPO Products were safe, researched, tested, validated, backed by science, and approved by dermatologists.

66.    Defendants told Plaintiffs, the Class, and the Subclasses it is a leader in the industry, committed to continuous innovation, and have pioneered science-based solutions helping to maintain, treat, correct and restore healthy skin.[64]  Defendants promised it only seeks eco-certified ingredients and only use FDA compliant ingredients for over-the-counter use.[65]  Defendants side stepped the lack of safety of its BPO Drug Products and told consumers both BPO and salicylic acid have advantages for acne treatment and complement each other.[66]

---

[62] *Id.*
[63] Centers for Disease Control and Prevention, *The National Institute for Occupational Safety and Health Pocket Guide to Chemical Hazards, Benzene Exposure Limits,*  https://www.cdc.gov/niosh/npg/npgd0049.html.
[64] Alchemee, *Innovation,* https://www.alchemee.com/innovation (visited November 6, 2023).
[65] *Id.*
[66] Alchemee LLC, *Is Salicylic Acid or Benzoyl Peroxide Better?*  https://www.proactiv.com/blog/acne-skin-care-ingredients/salicylic-acid (visited October 25, 2023).

67.     Proactiv's benzene concentration levels in the Valisure testing were many multiple times higher than any level permitted by regulators. The researchers wrote:

> "Incubation of a Proactiv® product at the temperature of a hot car (70°C), a temperature the Products are expected to be exposed to through normal consumer and distributor handling, resulted in the detection of benzene in a compact car's volume of air at ~1,270 times the Environmental Protection Agency's ("EPA") calculated threshold for increased cancer risk by long-term inhalation exposure to benzene."[67]

68.     Defendants' misrepresentations and omissions misled Plaintiffs, the Class, the Subclasses, and the public regarding the safety, stability, and quality of the BPO Products.  Defendants' broad claims of safety in their marketing, social media, and on websites gave consumers a false sense of safety leading them to believe the BPO Products were safe.  Defendants made these statements uniformly to Plaintiffs, the Class, the Subclasses, and the public, while shirking their responsibility to do adequate and meaningful testing before selling them to the public.  Defendants' statements and affirmations were false, misleading, unsubstantiated, and blatantly deceptive.

## I.     DEFENDANTS DID NOT WARN CONSUMERS THE BPO PRODUCTS WERE AT RISK OF BENZENE CONTAMINATION

69.     Defendants represented to the Plaintiffs, the Class, the Subclasses, and the public, that each of their Products had only the ingredients listed on the label and package, but none of them identified benzene anywhere on the Products' label, container, or packaging.

70.     Defendants told consumers BPO is a "tried and true" ingredient that has been the "gold standard for acne treatment for 50 years."[68] And BPO was safe to use "for an extended period of time."[69] None of the Proactiv Products list benzene on the

---

[67] *Id,*
[68] Alchemee LLC, *What Is Benzoyl Peroxide?* s://www.Proactiv.Com/Blog/Acne-Skin-Care-Ingredients/Benzoyl-Peroxide (last visited October 25, 2023).
[69] *Id.*

CLASS ACTION COMPLAINT

1  label, container, or anywhere on Defendants'' website.[70] Defendants assured consumers
2  that any side effects from use of Proactiv were "usually mild such as drying and
3  irritation."[71]

4      104. Defendants' statements about the BPO Products' ingredients were false,
5  deceptive, and misleading.  Defendants' statements were meant to convey to Plaintiffs,
6  the Class, the Subclasses, and the public the Products were safe and did not contain
7  carcinogens such as benzene. Defendants made these statements and omitted benzene
8  from all advertising, labeling, and packaging when they knew or should have known
9  the statements were false, misleading, and deceptive. Reasonable consumers, relying on
10 Defendants' statements reasonably believed the BPO Products were safe and did not
11 contain benzene.

12 **J.    DEFENDANTS DIRECTLY MARKETED BPO PRODUCTS AT**
13 **RISK OF BENZENE CONTAMINATION TO CHILDREN AND**
14 **TEENAGERS**

15     71.    Defendants' BPO Products are widely used by children and teenagers as a
16 standalone treatment or in combination with other BPO Products. Defendants knew that
17 adolescents are the largest users with users as young as 7-10 years old. Defendants
18 recommended that consumers, including children, use the BPO Products one to three
19 times a day, over many months or longer for persistent acne. Defendants knew that
20 some consumers would use the BPO Products for many years starting in their teens.
21 There is no cure for acne. Defendants knew that consumers with chronic acne would
22 use their BPO Products several times a day throughout their lifetime.

23     72.    Defendants aggressively marketed the BPO Products directly to children
24 and teenagers knowing, or they should have known, the BPO Products degrade to
25 benzene under normal use and storage conditions.  Many of Defendants' online and
26 print advertisements featured children, teenagers, eye-catching props, music, and colors

27 ---

28  [70] *See e.g.*, Proactive Repairing Treatment Package, 2 Fl Oz [60 Ml].
    [71] Alchemee LLC, *Does Proactive Have Any Side Effects?*  https://www.Proactiv.Com/Faqs, (last visited October 25, 2023).

1  meant to attract teens and pre-teens, and appeal to their preferences, activities, and

2  interests.

3      73.   Defendants encouraged parents to start treating teenage acne early with

4  benzoyl peroxide drug products.[72] Defendants promised the Products were "safe and

5  effective for teens" and "penetrate deeply into the pores to kill acne."[73]

6      74.   Defendants' marketing of BPO Products without mentioning benzene, the

7  risk of benzene exposure, or lack of testing for benzene was misleading, fraudulent,

8  deceptive, and dangerous.

9              **V.   PUNITIVE DAMAGES ALLEGATIONS**

10      75.   Defendants' conduct was done with malice and reckless disregard for

11  human life.  Defendants knew the BPO Products degraded to benzene when exposed to

12  heat under normal consumer use, handling, and storage conditions. Defendants further

13  knew that benzene is a known human carcinogen that is not supposed to be in the BPO

14  Products due to the grave risk of harm to consumers.  Defendants disregarded this

15  information and the known risks of benzene exposure and deliberately omitted benzene

16  from the list of ingredients, the BPO Products' labels, and their social media and

17  websites where information about the BPO Products is found. Defendants consciously

18  and deliberately crafted the BPO Products' marketing, labels, packaging, containers,

19  and warnings intending to mislead Plaintiffs, the Class, and the public, and lead them to

20  believe the BPO Products were safe and carcinogen-free.

21      76.   Defendants marketed themselves as expert drug formulators, researchers,

22  and merchandisers skilled in developing safe and reliable products while withholding

23  material health and safety information Defendants knew were essential to informed

24  consumer decision making.  Defendants knew that, by their conduct, they were robbing

25  consumers of their right to choose safe products.

26      77.   Defendants were on notice of benzene findings in consumer and drug

27  _____

[72] Proactiv, *Proactiv Blog, 5 Reasons to Treat Acne Early,* https://www.proactiv.com /blog/treating-face-
28  acne/reasons-to-treat-bad-teenage-acne-early (last visited October 7, 2023).
[73] *Id.*

27

**CLASS ACTION COMPLAINT**

products leading to widely publicized recalls. Defendants were on notice of the FDA's concerns of benzene contamination in drug and consumer products and received the FDA's 2022 directive to test Products for benzene contamination.  Defendants disregarded these notices and continued to market and sell the BPO Products without testing them for benzene.

78.    Defendants knew their decisions and chosen course of conduct was risky and would cause consumers to be exposed to benzene. Defendant's' conduct was not by accident, but was deliberate, calculated, and informed.  Defendant knew they could sell more BPO Products and earn more money by concealing material human health and safety information. Defendants further knew that testing the BPO Products for benzene would yield findings of benzene requiring recalls and/or a shutdown of production causing significant losses of income.  Defendants' goals were met not only because of their false and deceptive advertising, labeling, and packaging, but through a comprehensive scheme of aggressive marketing and image branding leading consumers to believe they were acne treatment experts dedicated to drug research, development, and safety and using only the safest ingredients and formulations that would remain pure and stable until the designated end.  Defendants' conduct and concealment of material health information was done to further their own monetary gain and with conscious disregard of the Plaintiffs, the Class, the Subclasses, and the public's right to choose safe products. Defendants' conduct was intentional, calculated, blatantly deceptive, unscrupulous, and offensive to consumer health and public policy.  To redress the harms caused by Defendants' conduct, Plaintiffs, on behalf of the Class, and Subclasses, seek punitive damages against the Defendants.

## VI.    PLAINTIFF SPECIFIC ALLEGATIONS

79.    Plaintiff Diane Howard is an Illinois resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for her skin and face, Plaintiff Diane Howard was particularly concerned about deep cleaning and preventing pimples on her

28

skin and face. Plaintiff read the front labeling of the product which encouraged her to purchase the product by Defendants. Based on the statements made by Defendants, their widely recognized name, and lack of information that the Products contained carcinogens such as benzene, Plaintiff believed the Products were safe to put on her skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

80.   Plaintiff Howard bought Proactiv+ Skin Smoothing Exfoliator, Proactiv Cleanse-Renewing Cleanser, Proactiv Emergency Blemish Relief, and Proactiv Repairing Treatment and used it daily from October 2018 to August 2023 for pimples on her skin and face. Plaintiff was unaware when she bought the Products that it was contaminated with benzene or that it could degrade to benzene. Had Defendants been truthful and told Plaintiff she would be exposed to benzene and/or be at increased risk of cancer, she would not have purchased Proactiv+ Skin Smoothing Exfoliator, Proactiv Cleanse-Renewing Cleanser, Proactiv Emergency Blemish Relief, and Proactiv Repairing Treatment.

81.   Plaintiff Howard suffered an ascertainable economic loss because of Defendants' statements and misrepresentations in that she bought the Product she would not have bought but for Defendants' statements and misrepresentations.

82.   Plaintiff Chatham Mullins is a Massachusetts resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for her skin and face, Plaintiff Chatham Mullins was particularly concerned about the ingredients, being cruelty-free, and products that are approved and sold in the European Union (EU). Based on the statements made by Defendants, their widely recognized name, and lack of information that the Products contained carcinogens such as benzene, Plaintiff believed the Products were safe to put on her skin. defendants' representations and omissions of human health and safety information were material to Plaintiff.

83.   Plaintiff Mullins bought Proactiv+ Skin Smoothing Exfoliator, Proactiv

CLASS ACTION COMPLAINT

Solution® Renewing Cleanser, and Proactiv+ Pore Targeting Treatment, and used them from 2005 to 2023 for resolving skin inflammation such as redness, cleansing and acne blemishes. Plaintiff was unaware when she bought the Product that it was contaminated with benzene or that it could degrade to benzene. Had Defendants been truthful and told Plaintiff she would be exposed to benzene and/or be at increased risk of cancer, she would not have purchased Proactiv+ Skin Smoothing Exfoliator, Proactiv Solution® Renewing Cleanser, Proactiv+ Pore Targeting Treatment.

84.    Plaintiff Mullins suffered an ascertainable economic loss because of Defendants' statements and misrepresentations in that she bought the Products she would not have bought but for Defendants' statements and misrepresentations.

85.    Plaintiff William Eisman is a Missouri resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for his skin and face, Plaintiff Eisman was particularly concerned about approval from dermatologists named Dr. Rodan and Dr. Fields. Based on the statements made by Defendants, their widely recognized name, and lack of information that the Products contained carcinogens such as benzene, Plaintiff believed the Products were safe to put on his skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

86.    Plaintiff Eisman bought Proactiv+ Skin Smoothing Exfoliator, Proactiv Solution® Renewing Cleanser, Proactiv+ Pore Targeting Treatment, and Proactiv Emergency Blemish Relief and used them from 2013 to 2024 for clearing up acne on his face. Plaintiff was unaware when he bought the Product that it was contaminated with benzene or that it could degrade to benzene. Had Defendants been truthful and told Plaintiff he would be exposed to benzene and/or be at increased risk of cancer, he would not have purchased Proactiv+ Skin Smoothing Exfoliator, Proactiv Solution® Renewing Cleanser, Proactiv+ Pore Targeting Treatment, Proactiv Emergency Blemish Relief.

CLASS ACTION COMPLAINT

87.   Plaintiff Eisman suffered an ascertainable economic loss because of Defendants' statements and misrepresentations in that he bought the Products he would not have bought but for Defendant's' statements and misrepresentations.

88.   Plaintiff Christian M. Rainey is a Washington resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for his skin and face, Plaintiff Christian Rainey was particularly concerned about the effectiveness to control the blemishes and pores on his face. Plaintiff read the front labeling of the product which encouraged him to purchase the product by Defendant. Based on the statements made by Defendants, their widely recognized name, and lack of information that the Products contained carcinogens such as benzene, Plaintiff believed the Products were safe to put on his skin. defendants' representations and omissions of human health and safety information were material to Plaintiff.

89.   Plaintiff Rainey bought Proactiv Emergency Blemish Relief, Proactiv+ Pore Targeting Treatment, Proactiv+ Skin Smoothing Exfoliator and Proactiv Solution Renewing Cleanser and used it daily from 2008 to February 2024 for clearing blemishes and pores on his skin and face. Plaintiff was unaware when he bought the Products that it was contaminated with benzene or that it could degrade to benzene. Had defendants been truthful and told Plaintiff he would be exposed to benzene and/or be at increased risk of cancer, he would not have purchased Proactiv Emergency Blemish Relief, Proactiv+ Pore Targeting Treatment, Proactiv+ Skin Smoothing Exfoliator and Proactiv Solution Renewing Cleanser.

90.   Plaintiff Rainey suffered an ascertainable economic loss because of Defendants' statements and misrepresentations in that he bought the Product he would not have bought but for Defendant's' statements and misrepresentations.

91.   Plaintiff Tracey Cuomo is a Connecticut resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for her skin and face.

CLASS ACTION COMPLAINT

Plaintiff Tracey Cuomo was particularly concerned about the cost and effectiveness to maintain clean skin and prevent blemishes on her face. Plaintiff read the front labeling of the product which encouraged her to purchase the product by Defendants. Based on the statements made by Defendants, their widely recognized name, and lack of information that the Products contained carcinogens such as benzene, Plaintiff believed the Products were safe to put on her skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

92.   Plaintiff Cuomo bought Proactiv Solution Renewing Cleanser and Proactiv Emergency Blemish Relief and used it daily from March 2022 to July 2023 for blemishes on her face. Plaintiff was unaware when she bought the Products that it was contaminated with benzene or that it could degrade to benzene. Had Defendants been truthful and told Plaintiff she would be exposed to benzene and/or be at increased risk of cancer, she would not have purchased Proactiv Solution Renewing Cleanser and Proactiv Emergency Blemish Relief.

93.   Plaintiff Cuomo suffered an ascertainable economic loss because of Defendants' statements and misrepresentations in that she bought the Product she would not have bought but for Defendants' statements and misrepresentations.

## VII.  CLASS ACTION ALLEGATIONS

94.   Plaintiffs bring this case on behalf of themselves, and all others similarly situated as a Class Action under Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seek to represent a nationwide Class and Subclasses of consumers who bought Defendant's BPO Products. Excluded from this Class and Subclasses is Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors, and affiliated companies; Class counsel and their employees; and judicial officers and their immediate families as court staff assigned to the case.

95.   The Class does not seek damages for physical injuries, although each Plaintiff was physically harmed by being exposed to benzene.

96.   The Class will include a Nationwide Class and State Subclasses.

CLASS ACTION COMPLAINT

a.   **Nationwide Class**.  All persons who bought, for use and not resale, the BPO Products within the United States.

b.   **State Subclasses**.  All persons in each of the following states who bought for use, and not resale, the Products within: Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Pennsylvania, Ohio, Rhode Island, Nevada, and Washington.

97.   This action has been brought and may be properly maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest and the proposed Class meets the class action requirements under Rule 23 of numerosity, commonality, typicality, and adequacy of representation.

98.   Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves, and the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved.

99.   **Numerosity.**  Plaintiffs believe there are millions of Class members throughout the United States, and there are tens of thousands of Subclass members in each of the listed states, making the Class and state Subclasses so numerous and geographically dispersed that joinder of all members is inconvenient and impracticable.

100.   **Commonality.**  There are questions of law and fact common to all Class and Subclass members that predominate over questions which affect only individual Class members.  All Class and Subclass members were deceived and misled by Defendants through the same advertising, online representations, labeling, and packaging, which do not mention benzene and misrepresent the characteristics, ingredients, and safety of the BPO Products.  All Class and Subclass members bought Defendants' BPO Products and have suffered an economic loss because of Defendants' deceptions and omissions. Thus, there is a well-defined community of interest in the questions of law and facts common to all Class and Subclass members.  Other common

33

questions of law and fact in this dispute include, without limitation:

    a.  Whether Defendants' BPO Products degrade to benzene under common distributor and consumer handling, use, and storage conditions.

    b.  Whether Defendants tested the BPO Products for benzene before selling them to Plaintiffs, the Class, and the public.

    c.  When Defendants knew or should have known the BPO Products degraded to benzene.

    d.  When Defendants knew or should have known the BPO Products contain benzene.

    e.  Whether Defendants' advertising omitting benzene was deceptive, fraudulent, or unfair.

    f.  Whether Defendants' advertising omitting benzene was likely to deceive reasonable consumers.

    g.  Whether Defendants' conduct violated Connecticut consumer protection laws.

    h.  Whether Defendants' conduct violated Hawaii consumer protection laws.

    i.  Whether Defendants' conduct violated Illinois consumer protection laws.

    j.  Whether Defendants' conduct violated Massachusetts consumer protection laws including Mass. Gen. Laws Ann. Ch. 93A, § 1 *et seq.*

    k.  Whether Defendants' conduct violated Maryland consumer protection laws.

    l.  Whether Defendants' conduct violated Missouri consumer protection laws including Mo. Rev. Stat. § 407, *et seq.*

    m. Whether Defendants' conduct violated Nevada consumer protection laws including Deceptive Trade Practice Act, NEV. REV. STATUTES, Title 52, Chapter 598 *et seq.*

    n.  Whether Defendants' conduct violated New York consumer protection laws including New York Deceptive Trade Practices Law, NY Gen. Bus. §349(a) and NY Gen. Bus. §§ 350 *et seq.*

34

CLASS ACTION COMPLAINT

o.  Whether Defendants' conduct violated Pennsylvania consumer protection laws.

p.  Whether Defendants' conduct violated Ohio consumer protection laws.

q.  Whether Defendants' conduct violated Rhode Island consumer protection laws.

r.  Whether Defendants' conduct violated Washington's consumer protection laws.

s.  Whether Defendants breached the express and implied warranties made about the BPO Products.

t.  Whether Defendants were unjustly enriched by the Plaintiffs, the proposed Class, and Subclasses members' purchase of the BPO Products.

u.  Whether the Plaintiffs, the proposed Class, and Subclasses have been injured and if so, what is the proper measure of damages.

v.  Whether the Plaintiffs, the proposed Class, and Subclasses have the right to economic damages including compensatory, exemplary, and statutory remedies for Defendants' misconduct.

w.  Whether the Plaintiffs, the proposed Class, and Subclasses have the right to injunctive, declaratory, or other equitable relief and attorneys' fees.

101.  **Typicality.**  Plaintiffs' claims are typical of the claims of the Class and Subclasses because the claims arise from the same course of misconduct by Defendants, *i.e.,* Defendants' false and misleading advertising and their failure to disclosure benzene in the Products.  The Plaintiffs, and all Class and Subclass members were all exposed to the same uniform and consistent advertising, labeling, and packaging statements Defendants made about the Products. Because of the Defendants' misconduct, Plaintiffs, like all Class and Subclass members, were damaged and have incurred economic loss because of buying the Products believed to be safe.  The claims of the Plaintiffs are typical of Class and Subclasses.

102.  **Adequacy.**  The Plaintiffs will fairly and adequately represent and protect

35

1  the interests of all Class and Subclass members. Plaintiffs have no interests antagonistic

2  to the Class or Subclass members.  Plaintiffs hired attorneys experienced in the

3  prosecution of consumer Class Actions and Plaintiffs intend to prosecute this action

4  vigorously. Plaintiffs anticipate no difficulty in the management of this litigation as a

5  Class Action.

6  103.  Finally, this Class Action is proper under Rule 23(b) because, under these

7  facts, a Class Action is superior to other methods and is the most efficient method for

8  the fair and efficient adjudication of the dispute. The Class and Subclass members have

9  all suffered economic damages because of Defendants' deceptive trade practices, false

10  advertising, and omissions of material health and safety information. Because of the

11  nature of the individual Class and Subclass members' claims and the cost of the

12  Products, few, if any individuals, would seek legal redress against Defendants because

13  the costs of litigation would far exceed any potential economic recovery.  Absent a

14  Class Action, individuals will continue to suffer economic losses for which they would

15  have no remedy, and Defendants will unjustly continue their misconduct with no

16  accountability while retaining the profits of their ill-gotten gains. Even if separate cases

17  could be brought by individuals, the resulting multiplicity of lawsuits would cause

18  undue hardship, burden, and expense for the Court and the litigants, as well as create a

19  risk of inconsistent rulings across the country, which might be dispositive of the

20  interests of individuals who are not parties. A Class Action furthers the important

21  public interest of containing legal expenses, efficiently resolving many claims with

22  common facts in a single forum simultaneously, and without unnecessary duplication of

23  effort and drain on critical judicial resources. The Class Action method presents far

24  fewer management difficulties than individual cases filed nationwide and provides the

25  benefit of comprehensive supervision by a single court.

26  ///

27  ///

28  ///

CLASS ACTION COMPLAINT

# VIII. <u>CAUSES OF ACTION</u>

**A.     DEFENDANTS ENGAGED IN FALSE ADVERTISING IN VIOLATION OF VARIOUS STATE STATUTES, on** *Behalf of the Hawaii and New York Subclasses*

104.   Plaintiffs reallege and incorporate all other paragraphs in this Complaint and further allege:

105.   Plaintiffs bring this cause of action on behalf of themselves, and all members of the Hawaii and New York Subclasses*,* all of whom are similarly situated consumers.

106.   Defendants developed, researched, manufactured, tested, marketed, and sold the Products throughout the United States. Defendants knew or should have known through the Products' development, formulation, and testing, the Products were not chemically stable when exposed to certain expected and normal environmental and storage conditions and form benzene, as a toxic byproduct. Despite this knowledge, Defendants did not mention benzene in the Products' advertising, ingredient lists, labels, containers, or on websites or social media advertisements.  Defendants did not tell consumers they would be exposed to benzene, a human carcinogen, during normal and expected handling, use and storage of the Products, even with the Products' containers closed.

107.   Benzene, a human carcinogen, is a widely marketed and available consumer drug product, is material health and safety information Defendants knew Plaintiffs, the Class and Subclass members, and the public would want to know. Defendants not only omitted this material human health and safety information from advertising, online representations, blogs, labeling, packaging, and warnings, but aggressively marketed themselves as drug experts, innovators, researchers, market leaders, influencers, and companies committed to consumer safety who devote substantial resources to drug research and development.  Defendants' affirmations of safety and responsibility misled Plaintiffs, and the Class and Subclass members,

leading them to believe the Products were tested, verified, and safe.  Defendants further marketed the Products touting the approval of dermatologists, who were not aware of the presence of benzene in the Products and of Defendants refusal to conduct adequate and meaningful testing before marketing and selling the Products to the public and following the FDA's 2022 alert to specifically look for benzene.

108.  Defendants' acts and omissions constitute false advertising.  Defendants advertised the Products with the intent not to sell them as advertised.  Reasonable consumers, including Plaintiffs and the Class and Subclass members, exposed to Defendant' advertising would believe the Products were safe, verified, and free of benzene.

109.  Defendants' false and misleading advertising violated Hawaii's False Advertising Law, HI REV. STAT. § 708-871.  Defendant knowingly or recklessly made false and misleading statements in the Products' advertising to the public.[74]  Defendants further advertised the Products with the intent not to sell them as advertised and misrepresented the ingredients, quality, purity, safety, and character of the Products. Defendants knew or should have known the Products formed benzene under normal, handling, use, and storage conditions but did not disclose this to consumers or the public.  Defendants knew through the Products' development, formulation, research, and testing, the Products were not chemically stable when exposed to certain normal and expected environmental conditions. Defendants knew consumers would be exposed to benzene in the Products, even with the Products' original packaging closed.

110.  Defendants' false and misleading advertising violated New York's General Business Law § 350 *et seq*. ("GBL § 350"), which prohibits "[f]ales advertising in the misconduct of any business, trade or commerce or in the furnishing of any service" in

---

[74] HI REV STAT § 708-871, False Advertising: (1) A person commits the offense of false advertising if, in connection with the promotion of the sale of property or services, the person knowingly or recklessly makes or causes to be made a false or misleading statement in any advertisement addressed to the public or to a substantial number of persons. (2) "Misleading statement" includes an offer to sell property or services if the offeror does not intend to sell or provide the advertised property or services: (a) At the price equal to or lower than the price offered; or (b) In a quantity sufficient to meet the reasonably- expected public demand unless quantity is specifically stated in the advertisement; or (c) At all.

38

CLASS ACTION COMPLAINT

New York.  Under GBL § 350, "false advertising" includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect." Defendant violated GBL § 350 by advertising and selling the Products without disclosing material health and safety information, *e.g.,* benzene and the consumers risk of cancer from benzene. Defendant' false and misleading advertising was directed at consumers, the New York Subclass members, and the public, and caused consumer injury and harm to the public interest.

111.  Had Defendants been truthful in their advertising, online representations, labeling, and packaging about benzene, Plaintiffs, the Class, and Subclass members would not have bought the Products.

112.  Plaintiffs, on behalf of themselves, Hawaii and New York Subclass members suffered ascertainable economic losses because of Defendant's' misconduct because they bought the Products, they otherwise would not have but for Defendant' material misrepresentations.

113.  Because of Defendant's' misconduct, Plaintiffs, on behalf of themselves, the Class and Subclass members, seek recovery of their economic damages, attorneys' fees, punitive damages, restitution, and all other relief allowable by law, including an injunction to enjoin Defendant from continuing their fraudulent business practices.  The damages sought are ascertainable, uniform to the Class and can be measured and returned to the Class members.

**B.   DEFENDANTS ENGAGED IN DECEPTIVE TRADE PRACTICES IN VIOLATION OF VARIOUS STATE STATUTES, *on Behalf of Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses***

114.  Plaintiffs reallege and incorporate all other paragraphs in this Complaint and further allege:

115.  Plaintiffs bring this cause of action on behalf of themselves, and all members of the Nationwide Class and the Connecticut, Hawaii, Illinois, Maryland,

CLASS ACTION COMPLAINT

1   Massachusetts, Missouri, New York, Pennsylvania, Ohio, Rhode Island, Nevada, and
2   Washington Subclasses, all of whom are similarly situated consumers.

3       116.   Defendants' acts and omissions constitute deceptive business practices in
4   violation of Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New
5   York, Pennsylvania, Ohio, Rhode Island, Nevada, and Washington deceptive trade
6   practices laws.

7       117.   Defendants represented the Products had characteristics, uses, and benefits,
8   they did not, *e.g.,* Defendants represented the Products were pure, of good quality, safe,
9   and only contained the ingredients disclosed.

10      118.   Defendants represented the Products were not deteriorated or altered, when
11  they knew, or should have known, the Products degraded to benzene under normal and
12  expected use, handling, and storage conditions.

13      119.   Defendants represented the Products contained only the ingredients listed
14  on Defendants' websites, advertising, labels, and containers.  Defendants did not
15  disclose to Plaintiffs, the Subclass members, and the public the Products were at risk of
16  benzene contamination.

17      120.   Defendants advertised the Products with the intent not to sell them as
18  advertised.

19      121.   Defendants' acts and omissions violated Connecticut Unfair Trade
20  Practices Act, CONN. GEN STAT. ANN., § 42- 110, *et seq.,* which broadly prohibits
21  Defendants from engaging in unfair methods of competition and unfair or deceptive
22  acts or practices in the conduct of any trade or commerce such as those committed by
23  Defendants and alleged in this Class Action.

24      122.   Defendants' acts and omissions violated Hawaii's Uniform Deceptive
25  Trade Practice Act, HAW. REV. STAT. §481-A3 because Defendants: (1) caused the
26  likelihood of confusion or of misunderstanding as to the source, sponsorship, approval,
27  or certification of the Products; (2) represented the Products had characteristics,
28  ingredients, or benefits, they did not; (3) represented the Products were not deteriorated

CLASS ACTION COMPLAINT

or altered, when they were;  (4) represented the Products were of a particular standard or quality when they were not; and (5) advertised the Products with the intent not to sell them as advertised.

123.  Defendants' acts and omissions violated Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*. Defendants' used deception, fraud, false pretense, false promises, and omitted material health and safety information about the Products' degradation to benzene, and/or contamination with benzene, which Defendants intended the Illinois Subclass members to rely upon.

124.  Defendants' acts and omissions violated Maryland's Unfair or Deceptive Trade Practices Act, MD. COM. CODE, Title 13, Subtitle 3, §13-301 because Defendants: (1) represented the Products had characteristics, ingredients, uses, and benefits, they did not; (2) represented the Products were not deteriorated or altered, when they were; (3) represented the Products were of a particular standard or quality, when they were not.  Defendants' representations about the Products' ingredients, and omission of benzene were misleading, deceptive, incomplete, and not truthful in violation of Maryland's Unfair or Deceptive Trade Practices Act.

125.  Defendants' acts and omissions violated Massachusetts consumer protection law, MASS. GEN. LAWS ANN. Ch. 93A, § 1 *et seq.*, which broadly prohibits unfair and deceptive trade practices such as those committed by Defendants and alleged in this Class Action.

126.  Defendants' acts and omissions violated the Missouri Merchandising Practices Act, MO. REV. STAT. § 407, *et seq.*, which prohibits the use of deception, fraud, misrepresentations, or unfair practices by a business, *e.g.,* marketing Products as safe, approved, tested, and only containing the listed ingredients. Missouri's law further prohibits the suppression or omission of material facts such as the Products' degradation to benzene.

127.  Defendant's acts and omissions violated N.Y. GEN. BUS. LAW § 349, which prohibits Defendants from engaging in deceptive, unfair, and misleading acts and

practices such as those committed by Defendants and alleged in this Class Action. Defendants' misrepresentations and omissions caused consumer injury and harm to the public interests of protecting public health and the public's right to know about any harmful constituents in the Products.

128.  Defendants' acts and omissions violate Nevada Deceptive Trade Practice Act, NEV. REV. STATUTES, Title 52, Chapter 598 *et seq*. which prohibits Defendants from making false statements about their Products and advertising the Products without the intent to sell them as advertised.

129.  Defendants' acts and omissions violated Ohio's Consumer Sales Practices Act, OHIO REV. CODE ANN. § 1345.01, *et seq.* which prohibits sales practices that are deceptive, unfair, or unconscionable, and Ohio's Deceptive Trade Practices Act, OHIO REV. CODE ANN.§ 4165 *et seq*.

130.  Defendants' acts and omissions violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§201-1 *et seq.* because Defendants: (1) caused the likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of the Products; (2) used deceptive representations about the Products; (3) represented the Products had characteristics, ingredients, or benefits, they did not; (3) represented the Products were not deteriorated or altered, when they were;  (4) represented the Products were particular standard or quality when they are not; and (5) advertised the Products with the intent not to sell them as advertised.

131.  Defendants' acts and omissions violated Rhode Island's Deceptive Trade Practices Act, R.I. GEN. LAWS § 6- 13.1- 5.2(B), *et seq.* because Defendants: (1) caused likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of the Products; (2) used deceptive representations in connection with the Products; (3) represented the Products had sponsorship, approval, characteristics, ingredients, uses, benefits, they did not; (4) represented the Products were not deteriorated or altered, when they were; (5) represented the Products were of a

CLASS ACTION COMPLAINT

1  particular standard, quality, or grade, when they were not; and (6) advertised the

2  Products with the intent not to sell them as advertised.

3       132.  Defendants' acts and omissions violated Washington's Consumer

4  Protection Act, WASH. REV. CODE § 19.86.010, *et seq.,* which broadly prohibits

5  Defendants from engaging in unfair methods of competition and unfair or deceptive

6  acts or practices in the conduct of any trade or commerce.[75]  Defendants' concealment

7  of material health and safety information about the Products, which they knew or

8  should have known, was injurious to the public interests of protecting public health and

9  the public's right to know about any harmful constituents in the Products. Defendants'

10  conduct caused harm to the Plaintiffs, the Washington subclass members, and members

11  of the public who bought the Products without knowing they degraded to benzene.

12  Defendants' conduct has the capacity to cause harm to other persons who buy the

13  Products.

14       133.  Had Defendants been truthful in their advertising, labeling, and packaging

15  of the Products and not omitted material health and safety information about benzene in

16  and formed from the Products, Plaintiffs, the Class, and Subclass members would not

17  have bought the Products.

18       134.  Defendants' acts and omissions and violations of Connecticut, Hawaii,

19  Illinois, Maryland, Massachusetts, Missouri, New York, Pennsylvania, Ohio, Rhode

20  Island, Nevada, and Washington consumer protection statutes are ongoing and

21  continuing to cause harm.

22       135.  Plaintiffs, on behalf of themselves, Hawaii, Illinois, Maryland,

23  Massachusetts, Missouri, New York, Nevada, Pennsylvania, Rhode Island, and

24  Washington State Subclasses suffered an ascertainable economic loss because of

25  Defendants' misconduct because they bought the Products, they would not have bought

26  but for Defendants' misrepresentations.

27

28  [75] Under § 19.86.090, Washington consumers harmed by such practices may recover actual damages, the costs of the suit, including reasonable attorney's fees, and the court may, in its discretion, increase the award of damages to an amount up to three times the actual damages sustained.

**CLASS ACTION COMPLAINT**

136.  Because of Defendants' misconduct, Plaintiffs, on behalf of themselves, the Class and Subclass members, seek recovery of their economic damages, attorneys' fees, punitive damages, and all other relief allowable under the law.  The damages sought are ascertainable, uniform to the Class and Subclasses and can be measured and returned.

**C.      BREACH OF EXPRESS WARRANTY,** *on Behalf of the Nationwide Class and all State Subclasses*

137.  Plaintiffs reallege and incorporate all other paragraphs in this Complaint and further allege:

138.  Plaintiffs bring this cause of action on behalf of themselves, and all members of the Nationwide Class and the Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Pennsylvania, Ohio, Rhode Island, Nevada, and Washington Subclasses, all of whom are similarly situated consumers.

139.  The Uniform Commercial Code § 2-313 provides that an affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the promise.  Defendants advertised and sold the Products as safe, pure, of good quality, and only containing the listed ingredients. Defendants' advertising, labels, containers, packaging, advertising, and online statements did not mention benzene, leading consumers to believe the Products were safe for their ordinary use. Defendants' affirmations were uniformly made to Plaintiffs and the Subclass members by Defendants in the Products' advertising, labeling, packaging, and online statements and were part of the basis of the bargain between Defendants, the Plaintiffs, and the Class and Subclass members.

140.  Defendants' affirmations and promises are unlawful. When Defendants marketed, distributed, and sold the Products, Defendants knew, or should have known, the Products degraded to benzene under normal and expected use, handling, and storage conditions.  Defendants knew, or should have known, the Products formed benzene and therefore did not conform to Defendants' express representations and warranties to

**CLASS ACTION COMPLAINT**

1  consumers.  Plaintiffs, the Class, and Subclass members purchased the Products in

2  reasonable reliance on Defendants' statements.

3      141.  Because of Defendants' misconduct, Plaintiffs, on behalf of themselves and

4  the Class, and Subclass members, seek recovery of their economic damages, attorneys'

5  fees, punitive damages, restitution, and all other relief allowable by law, including an

6  injunction to enjoin Defendants from continuing their fraudulent business practices.

7  The damages sought are ascertainable, uniform to the Class and can be measured and

8  returned to the Class members.

9      **D.**    **BREACH OF IMPLIED WARRANTY,** ***on Behalf of the Nationwide***

10     ***Class and all State Subclasses***

11     142.  Plaintiffs reallege and incorporate all other paragraphs in this Complaint

12 and further allege:

13     143.  Plaintiffs bring this cause of action on behalf of themselves, and all

14 members of the Nationwide Class and the Connecticut, Hawaii, Illinois, Maryland,

15 Massachusetts, Missouri, New York, Pennsylvania, Ohio, Rhode Island, Nevada, and

16 Washington Subclasses, all of whom are similarly situated consumers.

17     144.  Defendants, as sellers of the Products, also made implied warranties

18 including warranting the Products were of the same quality and purity represented on

19 the labels, in advertising, and on Defendants' websites and in advertising.  Defendants

20 represented the Products were fit for the ordinary purpose and conformed to the

21 promises made on the containers, labels, advertising, and websites that all ingredients

22 were listed, and all warnings given.

23     145.  Defendants advertised their Products as safe, when they knew, or should

24 have known, the Products degraded to benzene. Defendants did not list benzene as an

25 ingredient or contaminant anywhere on the Products or advertising.  The Products are

26 not of the quality and purity represented by Defendants because the Products degrade to

27 benzene under normal use, handling, and storage conditions.

28     146.  Defendants did not tell Plaintiffs, the Class, or Subclass members the

**CLASS ACTION COMPLAINT**

Products were not fit for their ordinary use because the Products, as advertised and sold by Defendants, degraded to benzene under normal and expected handling, use, and storage.

147.  Defendants' affirmations that the Products were safe for use were uniformly made to the Plaintiffs, the Class, and Subclass members in the Products' advertising, labeling, and packaging, and on Defendants' websites, which were part of the basis of the bargain.

148.  Plaintiffs, the Class, and Subclass members purchased the Products in reasonable reliance on Defendants' statements, affirmations, and omissions of material health and safety information.

149.  Defendants' acts and omissions are ongoing and continuing to cause harm.

150.  Because of Defendants' misconduct, Plaintiffs, on behalf of themselves, the Class, and Subclass members, seek recovery of their actual damages, injunctive relief, attorneys' fees, punitive damages, and all other relief allowable under the law.  The damages sought are uniform to the Class and Subclasses and the actual damages can be measured and returned to consumers who bought Defendants' Products.

**E.    UNJUST ENRICHMENT,** *on Behalf of the Nationwide Class and all State Subclasses*

151.  Plaintiffs reallege and incorporate all other paragraphs in this Complaint and further allege:

152.  Plaintiffs bring this cause of action on behalf of themselves, and all members of the Nationwide Class and the Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Pennsylvania, Ohio, Rhode Island, Nevada, and Washington Subclasses, all of whom are similarly situated consumers.

153.  Defendants have unjustly profited from their deceptive business practices and kept the profits from Plaintiffs and the Class and Subclass members who purchased the Products.

154.  Defendants requested and received a measurable economic benefit at the

46

1  expense of Plaintiffs, the Class and Subclass members as payment for the Products.

2  Defendants accepted the economic benefits knowing the economic benefit received was

3  based on deception and omission of material human health and safety information.

4       155.  There is no utility in Defendants' misconduct and Defendants' enrichment

5  from the misconduct is unjust, inequitable, unconscionable, and against the strong

6  public policy to protect consumers against fraud.

7       156.  Because of Defendants' misconduct, Plaintiffs, on behalf of themselves, the

8  Class, and Subclasses, and the public seek recovery of their actual damages,

9  disgorgement of profits, injunctive relief, attorneys' fees, punitive damages, and all

10  other relief allowable under the law.  The damages sought are uniform to the Class and

11  Subclasses and the actual damages can be measured and returned to consumers who

12  bought Defendants' Products.

13              **IX.   PRAYER FOR RELIEF**

14       157.  WHEREFORE, Plaintiff pray for judgment against Defendants:

15       158.  That the Court determine this action may be maintained as a Class Action

16  under Rule 23(a) and (b)(1), (2) and (3) of the Federal Rules of Civil Procedure:

17       a.  That Defendants' misconduct be adjudged to have violated the state

18            consumer protection laws identified herein;

19       b.  That injunctive and declaratory relief be awarded against Defendants,

20            including but not limited to an order prohibiting Defendants from engaging

21            in the alleged misconduct;

22       c.  That Defendants be ordered to disgorge profits and revenues derived from

23            their course of misconduct and that such unjust enrichment be restored to

24            the class and or distributed cy pres as the Court shall deem just and

25            equitable;

26       d.  That Plaintiff recover all compensatory damages and other damages

27            sustained by Plaintiff;

28       e.  That Plaintiff recover punitive damages as allowed by law;

47
**CLASS ACTION COMPLAINT**

f.   That Plaintiff recover all statutory damages as allowed by law;

g.   That Plaintiff recover their attorneys' fees and all costs of suit;

h.   That Plaintiff recover all Statutory pre-judgment and post-judgment interest on any amounts; and

i.   That all further relief as this Court may deem just and proper be granted.

## X.   **DEMAND FOR JURY TRIAL**

159.  Demand is made for a jury trial.

Dated:  March 6, 2024                **WISNER BAUM LLP**

By:  */s/ R. Brent Wisner*
R. Brent Wisner, Esq, (SBN: 276023)
rbwisner@wisnerbaum.com
11111 Santa Monica Blvd, Suite 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile:  (310) 820-7444

*Attorney for Plaintiff*

CLASS ACTION COMPLAINT